Great. Then we are ready to hear argument whenever you gentlemen are ready to present it. Great. Good morning. May it please the court, counsel. My name is Robert Carpenter and I'm here for Ms. Guerrero and her minor rider daughter Ruth. I'm going to jump right in and address the ability and willingness to protect because I believe this case turns on that question to a large extent. The agency, the IJ and the board both erred in assessing whether or not the Salvadoran authorities had the ability and willingness to protect the petitioners. They erred because they only looked toward whether or not the government was willing and not whether they were able. This was a fatal error in their analysis. And the quintessential reason why that's true from reading the opinions is because they ascribe the logic of because the gang members were worried about being reported to the police, the police must arrest gang members and therefore there's an ability to protect. Flawed argument. That the willingness to perhaps protect doesn't equate to an ability. And the country condition evidence that was submitted shows a plethora of reasons why you shouldn't believe that that's true. Counsel, can you hear me? Yes. Okay. So on this point, your client testified that of instances where gang members were locked up, right? That is true. And the agency relied in part on the country report, which showed that 16,215 inmates, 16,250 individuals who are current or former gang members were incarcerated, were locked up, right? That's true. So why is that not germane to the question of willing and able? If you've, if your client testified as to knowledge of people, gang members who were locked up and there were 16,000 plus gang members who were jailed, why isn't that relevant? Well, I would concede that it is relevant to the question of willingness, but what 16,000 means in the context of a country that was completely overridden by the Mars is open to question. We don't know the answer to that, but what we do know is the same country condition report, your honor outlined widespread corruption, weak rule of law, increased levels of impunity and abuse, a lack of respect for court orders, violence by gangs on a local family. Counsel, if it's, if it's open to question on the record that we have here, how can we say that every reasonable adjudicator would have had to decide the way you are urging us to? Because I don't think that the fact they arrested people goes to ability. It only goes to willingness. And the case law is clear. Uh, it has to be both, uh, JR versus bar says that it's both. I have a, a, a, a related question, but I think, um, we're having a little bit of a delay. Forgive me. I think you weren't done answering judge Bennett's question. So, so please finish before I jump in. Sure. I was, I meant to say that, uh, I agree that it goes to willingness, but not the ability, um, uh, JR versus bar says that we need both. We don't know that that was effectual and all of the country evidence, including the credited testimony is that it was not effectual. So there is no, there is no testimony that says that it was effectual. There's simply, uh, testimony and there's no testimony. There's country condition evidence that shows there was willingness, but nothing to show that they had the ability. All right. My somewhat related question is that there's, um, um, we have authority that says that the, the BIA isn't required to mention every bit of evidence in the country conditions reports, of course. But in this particular case, um, we have a petitioner and her daughter who are specifically concerned about, um, the danger to women and to young girls in El Salvador and the country conditions do speak to that, but the BIA did not. Do we have any authority that indicates that the BIA errs by not addressing particularly relevant, um, um, country conditions? Yes. The invite to a decision says that, uh, if, if relevant and germane information isn't discussed, uh, that that's a matter for remand. So I'll agree with the fact that the government, the agency discussed the country condition reports, but only cherry picked it. Didn't discuss any of the other relevant evidence, um, that all militated towards a lack of an ability to control. Sir, I, I, I'm working really hard to try to hear you, but I'm not sure that I understood if you, um, if you, if you did provide any particular authority for that. Um, I didn't hear it. So I apologize. Uh, can you hear me better? Yes. If you can try to keep your voice up, I'm sorry, this is a little less than perfect. Usually we do quite well by video, but we're having a little bit of a, you're just a little bit muffled. So if you can tell me, do you have any authority for the proposition that the BIA errs if it doesn't particularly address country conditions reports that are, um, relevant to the harm, um, uh, described? Sure. The most relevant decision would be the Mondragon versus older decision, wherein the agency, uh, only addressed the and not the ability to control the data cartel in Mexico. That's probably the most relevant, uh, decision on your question. Okay. That's all the questions I had. Do you have questions? No further questions. Is there more you would like to tell us, or would you like to reserve your time? Uh, I'd like to reserve a minute if we could. Well, you certainly got plenty of time to reserve. So we'll, we'll, uh, I'm just not sure if you, are you, are you ready to stop now and hear it from opposing counsel? No, I do have a couple of other points. Go right ahead. Thank you. The first is on the question of whether or not there was a nexus. Uh, the IJ seems to concede there was in footnote three of its opinion. And, uh, that's really problematic, not just for asylum, but also for withholding where the standard is for nexus is much lower. It's only a reason, not one central reason. So the IJ completely, uh, missed on explaining. And so too, did the board why, uh, you know, why family wasn't a reason when footnote three clearly indicates it likely was. Uh, and so that's deserving of a remand on its own and I'll reserve the last minute. Okay. Thank you. We'll hear from opposing counsel, please. Thank you, your honors. May it please the court. My name is Brandon Callahan on behalf of the agreeing with my opposing counsel that I think this case really does turn on the question of whether or not substantial evidence supports the agency's finding that the Salvadoran government go a little bit slower. Mr. Callahan, you've got plenty of time. I apologize, your honor. Uh, the case really does turn on whether or not substantial evidence supports the agency's finding that the Salvadoran government was not and would not be both unable, unwilling and unable to assist Ms. Guerrero-Vialta and protect her from the gang members she fears. And on that point, I think the record contains significant evidence, both on a generalized national level and in a specific, uh, case specific level. As a judge Bennett discussed a little bit, uh, and the immigration judge pointed out the record documents 16,000 gang related arrests. It documents the number of people in prison. I, I, excuse me, your honor. Because we don't know whether they joined gangs once they got to prison or not. And your point's well taken. 16,000 sounds like a lot of people, but it is a different population. It's the prison population. It doesn't tell us anything about the people who are in gangs and not in prison, right? That's certainly true, your honor. Yes. And I apologize for misspeaking. It is, it is a documenting the number of inmates, but still 16,000 gang related inmates as of 2016 is an appreciable, uh, demonstration of the government's willingness, certainly. And I would argue that there's an ability behind that number. The government has to be able to actually apprehend, try and incarcerate these people, all parts of a question of ability. Um, that's why it'd be more helpful. And we can't get, you know, perfect records always, but that's why it would be more helpful if we knew how many of those folks were gang members before they went to prison as opposed to, um, joining gangs once they were there. But, but I digress, go right ahead. Certainly, your honor. And I agree. There's more information that would be relevant here that we don't have. And I think that that point is really salient to the consideration of the case because of the standard of review here, there has to be enough evidence in the record to compel a reasonable fact finder that, uh, the government was or would be unable and unwilling. And I would argue that we don't have that here. What we have is a demonstration on a broad national level that the government has a willingness, certainly. And I would argue an ability. Uh, we also, I would like to just point out that the country conditions evidence, uh, on two 96 through two 98 of the record talks about the extraordinary measures, I believe is the term that the Salvadoran government uses that they're undertaking to try to control gang crime and violence, both in the country nationally. And I think importantly to your honor's point in the prison system. Uh, so again, I think that demonstrates a willingness certainly, and an ability at least to some extent to try to subdue the gang activity in the country. And I think here it's important to remember the guidance in Hussein versus Rosen, that the national government, the Salvadoran government is not required to prevent all risk of harm. And I believe the court's words in Hussein were that the government is not on it, willing or unable when it quote, demonstrates efforts to subdue said groups, which I think on a national level, we have evidence that they are working to subdue the group. But in addition to this national level evidence, we also have specific evidence that your honor's addressed with my opposing counsel a little bit. Uh, I think the first piece of evidence is, I believe judge Bennett asked about this. The gang clearly does not want to interact with the police. The specific gang members that Ms. Guerrero-Vialta fears do not want to interact with the police. Two of the three threats she received were about avoiding interaction with the police. Uh, and I think that Ms. Guerrero's statement on 172 of the record, that the gang members don't want to interact with the police because they know that they could be arrested, tried and incarcerated is really telling because these specific gang members in the area she lives have that fear by her own acknowledgement. So that demonstrates both that the gang believes that the police are willing and able and that the regular citizens who aren't gang members believe that the police have at least some willingness and ability to control the gang. I think that, uh, there's another discussion on page 166 and into 167 of the record, uh, where Ms. Guerrero-Vialta is discussing the second threat she received when she was kind of passing gang members on the way out of a local festival. And they asked her if there were any police up ahead. And the threat was something like, if you're wrong, we're going to take it out on you. Uh, but in there she, she was asked, why do the gang members not want to see the police at this festival? And she gave an explanation about how they carry guns. And if the police see them with the guns, the police will take the guns away from them, which again is demonstrating a willingness and an ability in reference to these specific criminals, uh, to control them and protect the general population. The last point I would like to make on the question of unwilling and unable, or I guess the case specific evidence I would like to reference is the fact that the gang member Cairo, who is the, by Ms. Guerrero-Vialta's testimony, the leader of the gang, at least in her area. And I would point out the only gang member present at all three threats was arrested and incarcerated. He got out after two months. He did your honor. That is her testimony. But I think it's important to remember what we don't know about those proceedings. If we take what Ms. Guerrero-Vialta testified to as correct information, then we know that he was arrested in relation to a murder, but we don't know anything about the charges. We don't know if he was charged with murder or, you know, some kind of aiding and abetting crime. We have no idea. Uh, we also don't know anything about the hearing that she says he participated in. And I think that we don't have really very much evidence about the result of that hearing. She says he had a hearing and he was released after two months. It's not clear, did that end in a conviction or an exoneration? It's very likely, or I guess just as likely, that he could have been convicted of some crime significantly less than murder. Why does it matter? I'm sorry, whether he was convicted or not, if he's back on the street and harm people. I think the orderly operation of Salvadoran law and the court system demonstrates an ability, but we don't know. And that's my point is again, it may not signal corruption. Exactly. Your honor. Yes. I mean, I guess we also don't know, but correct me if I'm wrong. Uh, from her testimony, I couldn't, I thought it's conceivable. And I don't know anything about the bail structure that he could have been released on bail. It wasn't clear to me whether this was the final determination or not. I would agree your honor. There's a discussion in her testimony about him having a hearing to see if there was enough evidence or something like that, but we're not, I'm it's, there's nothing really very legal in that discussion about what exactly that hearing was. And I bring this up only to point out that it may demonstrate, it's just as likely to demonstrate an orderly operation of Salvadoran law. We can disagree about how effective those procedures may or may not be, but, uh, it's just as likely to demonstrate an orderly operation as it is to demonstrate an inability to control these gangs or to support any kind of argument about, you know, the inability of the government or any kind of fear of reprisal or anything like that. Counsel, could you turn to the question I have about, um, I mentioned it, I asked it to opposing counsel. We don't require the BIA to, to, um, list every factoid from a country condition report, but it does seem to me to be striking. This is a woman who's got a very young child and the country conditions report lists particular harms that, and particularly, um, um, grave risk of sexual assault for young girls. And, and the BIA doesn't mention that at all. What should I make of that? Uh, your honor, I, I understand your point. Absolutely. But there is case law that, as you say, the board doesn't have to write an exegesis on the record. What about the most pertinent part of the record? What about the most pertinent part of the, of the country condition report? Yes, your honor. A very pertinent part. Uh, do we have case law about that? Should we be concerned about that? What's your best shot? I think it's, I think it's wise to be vigilant of that and to make sure that the board is considering all the relevant evidence. Uh, here, you know, the board adopted and affirmed the IJ's discussion and the IJ explicitly discussed the country conditions at reports, which is a strong indication that the agency reviewed those reports. Now I take your honor's point that certainly there's always, I think, more that could have been said, but this is not a case where we have an indication that the government overlooked relevant evidence. It's just a case of, as the court has said, not writing an exegesis on every piece of evidence in the record. But I do take your honor's point that the evidence about women in that, in El Salvador is relevant. I would point out that, uh, in appellant's brief, they discuss some of the evidence, uh, surrounding the country conditions, evidence about women in El Salvador. And with respect to my opposing counsel, I would take a little bit of issue with it because it's presented in their brief as if women are at particular risk of, uh, the police refusing to assist them. And that is not really, when you read deeper into the reports, what the reports talk about. Specifically, I'm looking at 348 of the record. The, uh, the, I believe the title is something like women in El Salvador. I'm sorry, I don't have the specific title on me. Um, but it talks about, I believe the phrase it uses is that there are important measures being implemented to protect women in El Salvador. So, uh, you know, I would say that there is obviously does acknowledge the difficulties for women in El Salvador, but again, going back to the standard of review, there has to be enough evidence for the court to find that any reasonable adjudicator would be compelled to find that the government was either unwilling or unable to assist her. And I think that it is certainly plausible that an adjudicator could find that, that the government was unwilling or able, I apologize if I could just, thank you. Uh, I think it's plausible, but I don't think it's here. And so I think keeping that standard of review in mind is very important. And unless your honors have any other questions, we would just ask that the court, uh, deny the petition. Thank you, counsel. I hear from opposing counsel who's saved a little rebuttal time. Yes. Uh, thank you, your honor. Uh, I, I, I'd like to spend my time on, on discussing the fact that the, uh, none of the record evidence, none of the country conditions that dealt with the Salvadoran government's inability, um, to control the gangs was discussed, not any of it. And there was plenty in there to be discussed. So this isn't weighing evidence that was positive against weighting evidence that was negative. We have no discussion about the violence against women. And, uh, that was described as being perpetrated with impunity. There was no discussion of the gangs taking over public transit and requiring IDs. And there was no discussion of authority saying that whole villages were closed down by the gangs with no ability to restore normal. That does not sound like an ability to control. Uh, and that's all that I have. And I appreciate your attention. Thank you. Judge Bennett, we getting ready to ask the question? No. No. Okay. All right. Well, it looks like we're, uh, ready to wrap up with this one. Thank you both so much for your advocacy. It's, uh, it was very helpful and we'll take this case under advisement and move on to the next case on the calendar. Thank you. Thank you.
judges: BEA, CHRISTEN, BENNETT